UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE
AT COOKEVILLE

| IN RE | ) | |
|---|---|---|
| | ) | |
| TRI STAR ALUMINUM CO., LP, | ) | No. 09-08974 |
| | ) | Chapter 11 |
| Debtor. | ) | Judge Lundin |
| | ) | **OBJECTION DEADLINE: OCTOBER 21, 2009** |
| | ) | **HEARING DATE: OCTOBER 27, 2009** |
| | ) | **HEARING LOCATION: 701 BROADWAY, CUSTOMS HOUSE, 2ND FLOOR, COURTROOM 2, NASHVILLE, TENNESSEE 37201** |

## OBJECTION TO DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN FILED BY THE OFFICIAL UNSECURED CREDITORS COMMITTEE

Comes now the Official Unsecured Creditors Committee (hereinafter the "Committee"), by and through proposed counsel[1], and respectfully objects to the approval of the Disclosure Statement and Confirmation of the proposed Plan filed by Debtor. In support of its Objection, the Committee would state unto the Court as follows:

I. OBJECTION TO DISCLOSURE STATEMENT

The Disclosure Statement does not provide "adequate information" as required under 11 U.S.C. § 1125. A debtor may not solicit acceptance of a plan until there has been circulated to creditors a disclosure statement approved, after notice and a hearing, by the court as containing adequate information. 11 U.S.C. § 1125(a) defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and condition of the Debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to . . . a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."

---

[1] Attorney Daniel H. Puryear has filed an Application to be retained and this pleading is filed on the assumption that said Motion will be approved by the Court.

The Disclosure Statement fails to adequately disclose: (a) any information from which creditors can discern the feasibility of the Debtor's proposed ongoing budget and expenditures, and ability to complete its Chapter 11 Plan, (b) a clear analysis that the Proposed Chapter 11 Plan is more beneficial to creditors than a liquidation, and (c) a disclosure of the potential material federal tax consequences of the plan to a hypothetical investor typical of the holders of unsecured claims. Each of these deficiencies is discussed in more detail below.

(a) <u>There is Insufficient Information from which to Determine the Feasibility of the Proposed Plan, and to the Extent that Information is Provided, it Suggests that the Plan is not Feasible</u>.

The Disclosure Statement does not contain any projections of income and expenses for the life of the Plan, and to the extent that the minimal information contained in the Pro forma budget attached to the Disclosure Statement purports to be such a projection, the duration thereof is too short and there is provided no underlying rationale supporting same. In fact, a review of Article III of the Disclosure Statement (which outlines the history of the Debtor's travails and the causes thereof) would suggest that none of the underlying causes of the Debtor's economic distress have been remedied to date. Specifically, the Debtor references "the dramatic decline in aluminum prices and demand over the last 18 months, the upheaval in the credit markets in 2008, and the overall recessionary environment" as precipitating the bankruptcy filing. The Debtor also references the "tightening of the credit markets" which led to the Debtor being unable to insure its receivables, and the continued volatility of commodity and energy prices over the last 18 months.

However, the Debtor makes no claim that any of these circumstances have changed. In fact, the only change thus far appears to have been the retention of Tortola Partners, LLC to provide restructuring advisory services, a move which Debtor asserts has proven to be a

"successful collaboration thus far, demonstrated by the fact that the company has remained in operation under the most difficult circumstances."

However, the Debtor's ability to simply remain in operation while availing itself of the protections of the automatic stay and the exclusivity period are not enough information on which to gauge the likelihood of future success. Rather, there must be information of such a nature that a creditor can make an informed decision. So what information is available? The Debtor asserts its intent to reject an executory contract with a uniform rental and cleaning service, if same has not already been rejected pre-petition. While there is no indication in the Debtor's Disclosure Statement or Schedules as to the monthly cost of such a contract, for a company with only 22 employees, it is safe to assume that this is a nominal cost, at most.

According to the Debtor's own Schedules filed with its bankruptcy pleadings, it had gross revenues in the first seven months of 2009 in the amount of $4,274,128.95, or an average of approximately $610,590.00 per month. However, Schedule A to the Debtor's Disclosure Statement anticipates gross revenues over the 12 months immediately following the anticipated effective date of only $3,522,000, or $293,500 per month. Debtor provides no explanation for this broad discrepancy in numbers, and in fact these projected numbers would appear to be inconsistent with the most recent Monthly Operating Reports filed by Debtor. For instance, in the most recent month covered by an operating report – September 2009, Debtor shows total deposits (presumably equaling gross revenues) of more than $380,000.00.

Furthermore, there is insufficient information to determine the necessity of the expenses identified on the pro-forma budget. For instance, a review of the two Monthly Operating Reports thus far indicate payments to Tri-Star Management Services, Inc, the

general partner of the Debtor, ostensibly for "management services." The Committee plans to file an objection to any further payments to the Debtor's General Partner for such alleged "management services," particularly in light of the retention of Tortola Partners for the same purpose, and for disgorgement of monies paid to the General Partner to date. However, for purposes of this Objection, it is unclear whether the anticipated $55,000-$61,000 in expenses per month allocated to "wages - plant and office" include payments to the General Partner of the Debtor. Furthermore, there is no evidence of the historical costs associated with each of the categories of expenses listed by Debtor, so that Creditors can make an informed decision concerning whether and where costs have been cut or modified in any way.

As a result of the above, creditors are unable to determine the basis for Debtor's projection of its income, the sources of anticipated income, the calculation of its projected expenses, or projected Plan payments. There is no reason, based on the Plan's Disclosure Statement to believe that the Plan will not be followed by the liquidation or the need for further reorganization of the Debtor. There is no apparent change in business model, no proposed cutting of unnecessary expenses, or any other information that would reasonably alert a creditor to how the business would be run differently. In fact, the little information that has been presented suggests that the single largest line item - payment of a "management fee" to the general partnership, will continue as a means of depleting the assets of the Debtor.

(b)    The Disclosure Statement and Plan Fail the "Best Interest of Creditors Test."

Rather than provide a comprehensive analysis of the estimated value to the estate in liquidating all collateral, the Debtor instead makes conclusory allegations that the Plan

satisfies the "best interest of creditors test" via its proposed liquidation analysis. In fact, there is no liquidation analysis or appraisals to support same – rather a mere assertion.

An adequate liquidation analysis must necessarily include all information on the assets of Debtor's general partner, Tri-Star Management Services, Inc, which remains jointly and severally responsible for the debts of the Debtor, and which has apparently been receiving payments of $30,000 per month for "management services" throughout the one year leading up to the petition date. Likewise, an adequate liquidation analysis must provide information on the financial condition of the guarantors of certain of the debt. Many of the secured creditors are owed debts guarantied by insiders of the Debtor – including Brenda Wilson, Gary Bunger, Lamar Scott, Mary Hays, Rick Wilson, Sheila Brown, and Terry Brown. In the event of the liquidation of the Debtor, the Committee would seek to invoke the doctrine of Marshalling of Assets, possibly requiring secured creditors to look to other than its collateral for the satisfaction of the debts owed it. *In re Jack Green's Fashions for Men – Big & Tall*, 597 F.2d 130 (8th Cir. 1979). Therefore, any liquidation analysis would necessarily have to include a discussion of the financial resources of the guarantors of the debts of Debtor, both corporate and individual, so that the Committee could discern how much of the debt might be satisfied from assets currently outside of the Debtor's estate.

(c) <u>Failure to Adequately Disclose the Potential Material Federal Tax Consequences of the Plan to a Hypothetical Investor Typical of the Holders of Unsecured Claims</u>.

The Debtor makes broad and conclusory assertions that it is aware of no tax consequences to the Creditors from the proposed Plan, but suggests that "Creditors . . . concerned with how the Plan may affect their tax liability should consult with their accountants, attorneys, or advisors." This language does not meet the burden imposed by 11 USC § 1125(a). It is not a "discussion" of the tax consequences for Debtor to advise Creditors to seek their own counsel.

5

## II. PLAN OBJECTIONS

While this objection necessarily only has to be filed at this time concerning defects in the Disclosure Statement, it is appropriate to also at this time object to certain deficiencies in the proposed plan.

(d) The Plan Violates the "Absolute Priority Rule." *See* 11 U.S.C. § 1129(b).

Specifically, the Plan proposes a payment of only ten cents (10¢) on the dollar to unsecured claimants and yet proposes to vest shares of stock in, among others, Joe Levanowicz (hereinafter "Levanowicz"). Upon information and belief, Levanowicz is the common law husband of Mary Hays. It violates the Absolute Priority Rule to allow Hays to retain her stock without requiring additional capital infusions, via a mere transfer of her stock from "one pocket to the other." It does not matter that the value of the shares being retained is speculative, at best. *Norwest Bank Werthington v. Ahoers*, 485 U.S. 197 (1988). Nor does it matter that the stock is technically retained by her common law husband instead of her. It has been held that a Plan fails to meet the absolute priority test where it proposes to transfer all of the Debtor's property to a corporation owned by parents of the Debtor's two shareholders for a nominal sum, thus permitting the shareholders to indirectly retain control of the Debtor's property. *In re Perdido Motel Group, Inc.*, 101 B.R. 289 (Bankr. N.D. Ala. 1999).

(e) Failure to Preserve all Viable Causes of Action.

In Article IX of the Plan, Debtor claims to preserve all actions for avoidance and recovery pursuant to § 550 of the Bankruptcy Code of transfers avoidable by reason of §§ 544, 545, 547, 548, 549 or 553. However, in the next paragraph it makes clear its intent to only pursue recovery of payments made within 90 days prior to the Petition Date, thereby excluding the insider payments made within one year, including but not limited to all

payments made to the Pearl Family Partnership, LP and Tri-Star Aluminum Management Co., Inc., the general partner of Debtor (on account of alleged "management services").

Therefore, to the extent that Debtor has failed to either identify or adequately preserve avoidance causes of action against insiders, the Plan fails to adequately preserve all causes of action. Furthermore, the Committee also objects to the Debtor's right to compromise, settle, or adjust any and all claims for payment of avoidance actions under § 550 without notice thereof to creditors and other parties-in-interest, inasmuch as a substantial number and/or amount of the potential avoidance actions may be against insiders of Debtor.

These obvious conflicts of interest have not been addressed, and in fact are implicitly provided for by allowing the Debtor to determine, in its sole discretion, which avoidance actions to pursue and which to settle, and for how much. Therefore, it is clear that continued supervision of the Debtor is necessary. The Plan does not provide for ongoing supervision of the Debtor and should provide for the continued operation of the Creditors Committee at the expense of the Debtor, until the payments to unsecured creditors have been made. *Creditors Committee v. Parkes Jaggers Aerospace Co. (In re Parkes Jaggers Aerospace Co.)*, 129 B.R. 265 (M.D. FL 1991). Furthermore, to the extent that payments to unsecured creditors depend on recovery of avoidance actions, and since said avoidance actions obviously involve insiders, the Plan should seek the appointment of a litigation trustee empowered to pursue said claims.

(f) <u>Violation of "Best Interests of Creditors" Test</u>.

The Committee objects to the language contained in Article XI of the Plan, wherein the Debtor seeks a ruling that "upon the payment of the first Class 11 Distribution, the Debtor will be deemed to have been granted a discharge under 11 U.S.C. § 1141 because

unsecured creditors will have received more than they would have received in a Chapter 7 liquidation.  For the same reasons already set forth above in the objection to the disclosure statement, Debtor objects to this language.

The Committee reserves the right to raise any and all additional objections brought to its attention by creditors who have claims of the kind represented by the Committee, and whose solicitations and comments have not yet been obtained due to the time constraints between the proposed retention of counsel and the deadline under which this Objection is filed.  Counsel for Committee will, pursuant to 11 U.S.C. § 1102(b)(3), provide access to, and solicit comments from, creditors holding claims of the type represented by the Committee, and present any additional comments to the Court at the hearing on this matter.

**WHEREFORE**, based on the foregoing, the Committee respectfully objects to the Disclosure Statement and confirmation of the Plan and requests that this Court deny the Debtor's Motion to approve the Disclosure Statement until such time as it complies with the requirements of 11 U.S.C. §§ 1125 and 1129, as well as any other applicable section, and for further relief as is just and proper.

Respectfully submitted,

*/s/ Daniel H. Puryear*
Daniel H. Puryear; No. 18190
Maximilian R. Loosen; No. 27388
144 Second Avenue North
The Pilcher Building, Suite 300
Nashville, TN 37201
(615) 255-4849 – Telephone
(615) 255-4855 – Facsimile
dpuryear@smythepuryear.com – E-mail
mloosen@smythepuryear.com – E-mail

Attorneys for the Official Unsecured Creditors Committee

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to those parties specifically requesting electronic service. The following parties will be served via first class, U.S. Mail, postage prepaid:

| | |
|---|---|
| Elliott Warner Jones | Beth Roberts Derrick |
| Drescher & Sharp, PC | Assistant U.S. Trustee |
| 1720 West End Avenue | 701 Broadway |
| Suite 300 | Customs House, Suite 318 |
| Nashville, TN 37203 | Nashville, TN 37203 |

Office of U.S. Trustee
701 Broadway
Customs House, Suite 318
Nashville, TN 37203

on this the 21st day of October, 2009.

      The parties may access this filing through the Court's electronic filing system.

      */s/ Daniel H. Puryear*
      Daniel H. Puryear